✎JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

APPENDIX H

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| Al's Auto, Inc. | Hollander, Inc.; Solera Holdings, Inc.; and Audatex North America, Inc. |

| (b) County of Residence of First Listed Plaintiff  Bucks, PA | County of Residence of First Listed Defendant  N/A |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |

| (c) Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |
|---|---|
| Marvin L. Wilenzik, John P. Elliott, Elliott Greenleaf, 925 Harvest Drive, Suite 300, Blue Bell, PA 19422 215-977-1000 | Paul T. Fox, Greenberg Taurig, LLP, Chicago, IL 312-456-8420 |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | | ☐ 710 Fair Labor Standards Act | ☐ 810 Selective Service |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | | ☐ 740 Railway Labor Act | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 790 Other Labor Litigation | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **SOCIAL SECURITY** | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 861 HIA (1395ff) | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | ☐ 862 Black Lung (923) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | ☐ 864 SSID Title XVI | |
| | | | | ☐ 865 RSI (405(g)) | |
| | | | | **FEDERAL TAX SUITS** | |
| | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| | | | | ☐ 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 1332

Brief description of cause:
Breach of Warranty

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

| DATE  2/14/08 | SIGNATURE OF ATTORNEY OF RECORD  John P. Elliott |
|---|---|

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

APPENDIX I

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Al's Auto, Inc. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| Hollander, Inc.; Solera Holdings, Inc.; | : | |
| and Audatex North America, Inc. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. §2241 through §2255.                                ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits                                          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                                          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                                           ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.                (X)

| | | |
|---|---|---|
| __2/14/08__ | __John P. Elliott__ | __Plaintiff__ |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-977-1027 | 215-977-1099 | jpe@elliottgreenleaf.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AL'S AUTO, INC**<br>**4339 Old Lincoln Highway**<br>**Trevose, Pennsylvania 19053-8417,** | : <br> : <br> : <br> : | No. _____ |
| **Plaintiff** | : <br> : | |
| **v.** | : <br> : | |
| **HOLLANDER, INC.**<br>**1 ADP Blvd.**<br>**Roseland, NJ  07068** | : <br> : <br> : <br> : | |
| **SOLERA HOLDINGS, INC.**<br>**6111 Bollinger Canyon Road, Suite 200**<br>**San Ramon, CA 94583** | : <br> : <br> : <br> : <br> : | |
| **AUDATEX NORTH AMERICA, INC**<br>**c/o National Registered Agents, Inc.**<br>**160 Greentree Drive, Suite 101**<br>**Dover, DE 19904** | : <br> : <br> : <br> : <br> : | **JURY TRIAL DEMANDED** |
| **Defendants.** | : | |

## COMPLAINT

This action is brought by Plaintiff, Al's Auto, Inc., seeking damages as a result of Defendant Hollander, Inc.'s repeated breaches of its warranties after selling Plaintiff a deficient software system that was intended to assist Plaintiff with its sales and inventory functions.

## THE PARTIES

1.     Plaintiff Al's Auto, Inc. ("Al's") is a Pennsylvania business corporation with a place of business at 4339 Old Lincoln Highway, Trevose, Pennsylvania 19053-8417.

2.      Al's is a family owned and operated business established in 1948.  Al's offers (i) used, new and rebuilt automobile parts, (ii) sales and installation of engines, transmission and rear ends and (iii) sales of rebuildable vehicles from its twenty (20) acre facility located in Trevose, Bucks County, Pennsylvania.

3.      Defendant Hollander, Inc. is a Delaware business corporation with its principal place of business in Plymouth, Minnesota.  Hollander was formerly known as and claims to be the successor in interest to, ADP Hollander, Inc. (Hollander, Inc. and its predecessor, ADP Hollander, Inc. are collectively referred to herein as "Hollander"). Hollander develops and sells software systems designed to assist businesses with their information management, including inventory and record tracking.

4.      Defendant Solera Holdings, Inc. ("Solera") is a Delaware Corporation with a principal place of business in San Ramon, California.

5.      Solera was founded in January 2005 by its Chief Executive Officer, Tony Aquila, and private equity firm GTCR Golder Rauner. Solera claims to be the leading global provider of software and services to the automobile insurance claims processing industry.

6.      Defendant Audatex North America, Inc. ("Audatex") is an indirect wholly owned subsidiary of Solera.  Audatex is a Delaware Corporation.

7.      Despite Hollander's claims to be the successor in interest to ADP Hollander, according to Solera's public filings with the United States Securities and Exchange Commission, on April 13, 2006, Audatex acquired all of the outstanding common stock of ADP Claim Services Group, Inc., its subsidiaries and ADP Integrated

Medical Solutions, Inc. from ADP and all of the outstanding common stock of ADP

Hollander, Inc. from ADP Atlantic Inc.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

Plaintiff is a citizen of Pennsylvania.   Defendants are dual citizens of Delaware and

Minnesota.   The amount in controversy exceeds $75,000.00, exclusive of interest and

costs.

9.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(a)(1)

because Plaintiff is a citizen of the Eastern District of Pennsylvania.

## BACKGROUND

10.      Al's utilization of systemic control is critical to its successful business

functioning because of the enormity of Al's parts inventory and the complexities and

intricacies of its sales operations.

11.      Prior to June 2002, Al's successfully and efficiently managed this

inventory through the use of the Powerlink 1.0 HYMS computer system (the "Former

System") installed, developed, sold and supported by Hollander.

12.      During 2001 and early 2002, Hollander advised Al's that Hollander would

no longer offer software enhancements to the Former System.

13.      Al's business mandates management and tracking an inventory of

approximately 175,000 used and new automobile parts.

14.      Hollander affirmatively represented to Al's that Hollander has in service

and was universally selling a new and superior system to replace and augment the Former

System.  Hollander characterized the latest system ("New System") as an upgrade.

3

15.     The New System (designated Powerlink 2.0) was proffered to Al's by Hollander as permitting Al's to modify Hollander's sales and inventory reports for Al's or, alternatively permitting Al's to custom design its own reports.

16.     Hollander's intent not to offer needed enhancements to the Former System materially impacted the position Al's faced as the Former System was so intimately integrated into Al's business, not accepting the New System mandated expensive and major difficulties for Al's.  Al's effectively had no meaningful choice.

17.     The Former System controlled and regulated recordation of Al's sales. These sales records were actually controlling for Al's buying and its customer offerings.

18.     Al's had invested over 500 hours of Al Gougler's personal time and many employee hours in entering into the Former System Al's zero quantity information records.

19.     Al's laptop computer and wireless inventory system was tied to the Former System's functions and an ISDN line to a vital employee's home work site operated through the Former System.

20.     Al's salesmen records were maintained by the Former System and invoices referenced a listing of each salesman involved in a sale.

21.     Inventory regulation is one of the pivotal aspects of Al's business.  The Former System maintained the inventory control.

22.     The Former System generated Al's management reports including all necessary fields.

23.     Hollander represented to Al's that the New System was operational in approximately sixty (60) salvage yards across the United States.

4

24.     Hollander was fully aware of each of the above System functions and their respective and collective importance to Al's.

25.     In Hollander's discussions with Al's concerning the New System Hollander never advised Al's even remotely, there would be major problems and business disruption from Al's use of the New System.

26.     Hollander also emphasized to Al's that ongoing operability of the New System would be assured and maintained by Al's purchasing from Hollander supporting products and equipment for the New System. Hollander told Al's these purchases were mandatory or the New System would be either inoperable or inaccessible or both.

27.     Hollander did not specify to Al's a particular and defined standard for the New System or the System's supporting products. Instead, Hollander, utilizing the inequality of its bargaining position, simply represented to Al's that the New System would perform in superior, improved manner the functions of the Former System, further stating the New System software would conform to its functional and technical specifications.

28.     Al's believed, and relied upon, Hollander's representations to it and had every expectancy of full, uninterrupted, actually better performance from the New System based upon Hollander's affirmative representations to Al's concerning the New System.

29.     Al's, in acquiring the New System, was committed totally to that System.

30.     Hollander knew or should have known the enormity of the New System's negative impact on Al's business and the disastrous results from any New System failure.

31.     Hollander had total familiarity with Al's business operation and the critical role the New System would have in that operation.  Hollander also knew of significant problems with the New System's operational capacities prior to the sale to Al's.  Despite this, Hollander failed to advise Al's that:

a.      Al's sales history would be incorrect for one year after installation of the New System because the New System assigned the date of installation to all activity for the year to date prior to installation thus presenting a major problem to Al's because all of Al's buying and selling decisions were based upon historic sales and activity.

b.      All of Al's zero quantity information records would be lost (notwithstanding that Al's invested hundreds of hours of time entering this data into the Former System.)

c.      Al's ISDN line to one of its key employee's home work site would not be usable with the New System.

d.      Al's existing laptop computer and wireless inventory system would not be usable with the New System.

e.      All previous salesmen records would be lost because all invoices prior to the conversion from the Former System to the New System would list a salesman as "administrator."

f.      Many of the operations previously performed under the Former System would require materially more time with the New System.

g.    Al's would not be able to print data displayed by the New System with one key as was done on the Former System without having to purchase an add-on program.

h.    Al's would not be able to keep up with inventory with the staff level in place at the time the New System was installed but would be required to hire additional personnel.

32.    Al's executed a contract with Hollander ("the Sales Agreement") in early February, 2002.  A copy of the Sales Agreement is attached hereto and made part hereof as Exhibit "A".

33.    Beginning with the first week of installation of the New System in June, 2002, significant problems arose.  Many of these problems remained inadequately addressed as much as sixteen (16) months later.

34.    For the first two weeks after installation, Al Gougler, Sr. and his two sons who work with him at Al's each personally devoted over eighty (80) hours per week attempting to assist Hollander in remedying numerous problems.  Until approximately October 2002 Al and his sons spent a minimum of (70) hours per week trying to correct problems with the New System.

35.    In many respects, the New System did not work as quickly or efficiently as the Former System.  These limitations were not disclosed to Al's by Hollander prior to selling the New System to Al's.

36.    Much of the sales data that was stored in the Former System could not be accessed using the New System.  This was also not disclosed by Hollander to Al's pre-sale.

7

37.    The problems Al's experienced with the New System materially and disastrously affected Al's ability to operate efficiently resulting in lost sales and costly wasted effort.

38.    Among other problems caused by the New System, never indicated by Hollander or discussed by Hollander prior to the New System's purchase, were:

a.    Al's seventeen (17) line phone system was overloaded with phone calls because the salesmen could no longer handle the normal amount of volume due to the many errors repeatedly occurring at their workstations (totaling initially from one hundred to one hundred fifty errors per day). Along with the numerous errors, there were also critical program speed issues and system speed issues. Al's sales plummeted, frustrations mounted, and several sales people threatened to quit.

b.    Management reports had to be created by an outside programmer hired by Al's because the New System was incapable of providing the reports that were created automatically by the Former System, and many required fields were omitted from the new reports.

c.    Al's was required to keep extra inventory because the New System was incapable of providing needed information concerning the scrap parts inventory and what was and was not selling. The storage racks were stuffed with dead inventory compelling Al's to purchase more racks to accommodate new inventory.

d.    Many of Al's employees were idle for significant periods of time because either (1) their workstations were not operational and had frequent errors or (ii) they could not get the necessary reports and information to continue with their work.

8

e.      Unlike the Former System, the New System did not alert Al's employees if they entered an incorrect vehicle identification number, thus raising the possibility that the parts might be considered stolen and confiscated by law enforcement personnel at the time the car into which the parts were installed was inspected.

f.      Search times on the New System were too long ranging from twenty seconds to one minute depending on the size of the customer and the date range entered.  These search times were less than one second in the Former System.

g.      The New System would not permit Al's employees to process multiple return items from the same invoice.  Instead, Al's employees were required to process each item separately which greatly increased the time spent on returns.

h.      The New System would not permit Al's employees to post credits directly to customer accounts.  Instead, Al's employees had to do each credit as "cash," then manually post to the customer's account.

i.      Al's could not provide Al's buyers with correct information resulting in purchasing cars from memory and purchasing of unneeded inventory.

j.      Posting of checks to customer accounts took hours because the New System would only permit Al's employees to apply the check at the rate of five invoices at a time regardless of the number of invoices to which the check related.  Under the Former System this would have taken less than a minute.

k.      The New System did not show and detail unpaid invoices on the customer's statements, only a balance forward.  Any backward adjustment to the balance forward date produced many pages of zero balance invoices.  Paid invoices were not cleared.

9

l.    Al's employees could no longer look up parts for a broad storage location as in the Former System.  Instead, they had to enter specific locations.

m.    The New System took two times as long to create stock ticket records for cars purchased.

n.    Because the New System calculated finance charges to four decimal points, it was impossible to post payments to these finance charges correctly because there was no way to achieve a zero balance.

o.    Parts put on hold could not be determined or seen even where the part was not sold.  This significantly interfered with the important capacity of salesmen to check on whether a part was held for another customer.  There were often parts in stock duplications, location vagueness, and indications of parts in inventory which did not exist.

p.    Al's could not print more than ten (10) "parts remaining reports" simultaneously without first exiting the screen and re-entering to add another ten (10).

q.    The dealer list price no longer showed on the "parts remaining report."  This information was crucial to making decisions concerning what parts to save from a car being scrapped.

r.    Multiple stock numbers would run together as one report in the New System.  They were printed as separate reports as in the Former System.

s.    A parts remaining report scans all stock ticket records before allowing you to choose the stock number(s) you want to print.  Microsoft Windows has a maximum of 32,000 records per window and Al's had 36,000 stock ticket records.  This caused errors and did not permit Al's to print parts remaining for some stock numbers.

t.     Invoice numbers were not converted from the Former System to New System.

u.     Title numbers were not converted from the Former System to New System.

v.     No quantity on hand field existed, so Al's could not tell how many parts it had unless it counted them physically.

w.     Al's could not print a report of inventory by a single part type in order to make business decisions such as price changes, parts to scrap or descriptions to change.

x.     When scrapping a vehicle through Bulk Maintenance, multiple quantity records which have 0 parts were not deleted. These had to be deleted manually.

y.     It now takes significantly longer to enter a car line. In the Former System one person was able to enter 12 cars per hour. In the New System one person is only able to enter 5 cars per hour.

z.     When the data was converted from the Former System to the New System incorrect model names were converted into a "new model name."

39.     After installation of the New System proved to be defective Al Gougler was informed by Hollander that there was no way to return to the Former system. This enormous detriment was never disclosed before purchasing the New System.

40.     Because of the New System's deficiencies and incompatibility with the Former System, Al's incurred the following damages:

a.    Al's sustained lost sales of $503,279 in the first seven (7) months of new systemic operation marked by persistent failures and disruption in the New System's performance.

b.    Al's sustained a $62,000.00 loss related to inventory resulting from the New System's performance failure.  Al's was not able to obtain from the New System reporting data necessary to inventory control and to avoid over-purchasing.  Previous controls in the Former System served as a check and prevention against such a very excludable expenditure.  The New System's redesigned reports were in an unworkable form.  Al's further believes, and therefore avers, Hollander's personnel lacked sufficient familiarity with the intricacies of the salvage business and, as well, Al's business, and did not coordinate or discuss sufficiently with Al's, its business needs.

c.    Hollander failed to adequately evaluate the impact of the System change on Al's personnel requirements.  In order to adapt the New System, Al's was required to hire an additional employee, who, with salary and benefits, cost Al's $37,500.00 annually.  The New System was also far more tedious to enter data.  The business disruption attributable to the New System's problems also required Al's to bring back full time a seasoned employee who was heretofore able to work from her home.  She had been equipped by Al's for at-home work with the Former System using an ISDN line.  The ISDN line was incompatible.  This excellent worker's loss would have been a significant blow to Al's.  Therefore, Al's was forced to raise her hourly rate by $5.00 per hour to cover her day care expenses.  This additional expense has been, and is, ongoing.

d.    Al's was compelled to endure additional racking and labor installation expenses.  Al's business was significantly dependent upon "Sales and

Activity." This refers to being able to track the number of times a particular part is looked up, as well as recordation of each sale. Specificity in these tasks was pivotal to avoid chaos and confusion. Al's normal, successful buying practices were keyed to these controls. When the New System disrupted these controls and unqualifiedly did not support these absolutely essential functions, Al's sustained catastrophic disruption. Al's buying matrix became impossible for a year. In one day, Hollander's New System confused existing and relevant data by rolling a year's data accumulation on to one day. Al's could not correctly and profitably address sales requests. Multiple requests were incorrectly indicated for each item by the New System creating a false demand. Al's employees, a loyal and hard-working group who took pride in their work, were frustrated and angry at their inability to correctly address their respective work responsibilities. Hollander never disclosed to Al's these consequences from the System change as a given. Hollander's efforts to correct the multiple problems of the New System were ineffective. The New System's innate flaws, which should never have existed, were emphasized by the New System's defying correction by its designer, Hollander, and Hollander's inept approach to the New System's correction.

    e. The New System, as never disclosed by Hollander prior to sale to Al's, created functional obsolescence by causing Al's wireless system to be inoperative. Al's employees could not enter the computer system by use of their laptops for inventory queries. Al's yard persons were deprived of ready contact. The New System proved incompatible with the heart of Al's business production system. Al's spent $18,000.00 to create and install the wireless system – an expense rendered a loss by Hollander's New System.

f.      At Hollander's request, Al's added computer memory at a cost of
$2,500.00. Thereafter, Hollander insisted the fact that Al's was running voice-over data
was the cause of the New System's many problems. Hollander told Al's rewiring the
System would correct problems. At a roundtable meeting with Al's, Hollander agreed to
reimburse Al's for the rewiring if it did not solve the problem. Al's spent $4,300.00 to
rewire the New System and separate the voice and data entry systems, which provided no
remedy for the New System's problems.

g.      Al's subsequently spent $8,000.00 for new processors and hard
drives and to upgrade the server, at Hollander's suggestion, in an attempt to improve the
performance of the New System, even though Al's server met the requirements on
Hollander's pre-installation checklist.

h.      Al's spent $2,400.00 for labor to repair a conversion problem of
incorrect model denomination, requiring cumbersome manual changing – yet another
undisclosed negative in Hollander's New System.

i.      The New System's response times were substantially slower than
with the Former System. Al's was required by Hollander to purchase additional RAM
(Random Access Memory) for all of their workstations in an unsuccessful attempt to
improve the performance of the New System.

j.      Al's spent significant hours correcting errors in the conversion of
model names and rounding off the finance charges in the New System so that they could
be properly posted.

k.      In order to pay its bills, which became more difficult because the
poor performance of the New System affected Al's revenue, Al's incurred costs in

14

borrowing money needed to replace working capital that was not received because of the problems with the New System.

l.      One of the most significant pre-sale promises made to Al's by Hollander was the ability of the New System to modify Hollander's reports and to permit Al's to create its own reports.  When the New System was installed, Al's, for the first time, learned Hollander's reports cannot be customized.  This was never at any time disclosed to Al's by Hollander.  Moreover, two key fields were not accessible to Al's through Crystal Reports because after Al's had contracted for the New System, Hollander arbitrarily declared these fields proprietary.

m.      Al's had to reboot its servers and all workstations daily to avoid an increase in errors.

n.      Al's sustained sixteen months of miserable systemic failure of the New System, unquestionably penalizing Al's financial position and costing Al's enormous financial losses.

o.      As a result of the cumulative actions and inactions of Defendants, Al's lost sales in the year 2002 were $503,279.00.

p.      Al's lost profits for the year 2002 were $241,440.00.

## COUNT I
## BREACH OF EXPRESS WARRANTY

41.     Plaintiff hereby restates and realleges each and every allegation set forth about the same force and effect as if set forth herein and repeated at length.

42.     Hollander was and may still be a merchant of computer systems used by the automotive industry.

15

43.     The sale of the New System is a sale governed by the provisions of Article 23 of the UCC.

44.     Pursuant to Section 3 of the Sales Agreement, Hollander "warrant[ed] that the Products (other than third party software applications as to which ADP Hollander makes no warranty) will conform to their respective functional and technical specification. Such specifications are subject to amendment from time to time by ADP Hollander, in which case the Products will conform to their modified respective specifications."

45.     Despite the reference to "functional and technical specifications" in the Sales Agreement, Hollander provided an inadequate list of specifications for the New System.

26.     Section 13(A) of the Sales Agreement provides:

[Hollander]'s sole liability to [Al's] or any third part for claims, notwithstanding the form of such claims (e.g. contract, negligence or otherwise) arising out of [Hollander]'s breach of the warranties set forth in Paragraph 3 above shall be to use commercially reasonable efforts to correct such inability, interruption, delay, error, omissions, bug, or other failure as soon as reasonable practicable.

46.     Al's gave Hollander prompt notice of the defects in the New System as required under Section 2607(3)(a) of the UCC.

47.     Notwithstanding such notice and the provisions of Section 13(a) of the Sales Agreement, Hollander contrary to its obligations to Al's, failed to correct the defects in the New System within a reasonable period of time, instead, permitting Al's to suffer the substantial problems and damages described above.

48.     Hollander's warranty failed in its essential purpose because of Hollander's demonstrated inability to repair or replace the New System to achieve the promised and required operational capability.

49.     Because the warranty provided by Hollander in the Sales Agreement failed of its essential purpose, Section 2719(b) of the UCC entitles Al's to any remedy available under the UCC.

50.     Section 2714 of the UCC provides in pertinent part:

(a)     **Damages for nonconformity of tender.**—Where the buyer has accepted good and given notification (Section 2607(c)) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the breach of the seller as determined in any manner which is reasonable.

(b)     **Measure of damages for breach of warranty.**—The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(c)     **Incidental and consequential damages.**—In a proper case any incidental and consequential damages under Section 2715 (relating to incidental and consequential damages of buyer) may also be covered.

51.     Section 2715 of the UCC provides as follows:

**2715. Incidental and consequential damages of buyer**

**(a) Incidental damages.**—Incidental damages resulting from the breach of the seller include:

(1) expenses     reasonable     incurred     in     inspection,     receipt, transportation and care and custody of goods rightfully rejected;

(2) any commercially reasonable charges, expenses or commissions in connection with effecting cover; and

(3) any other reasonable expense incident to the delay or other breach.

**(b) Consequential damages.**—Consequential damages resulting from the breach of the seller include:

(1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonable be prevented by cover of otherwise; and

(2) injury to person or property proximately resulting from any breach of warranty.

52.   Hollander was before and after execution of the Sales Agreement thoroughly familiar with Al's operating and computer requirements related thereto because Hollander had installed the Former System in Al's operation and supported the Former System since 1989.

53.   Hollander knew or should have known that the New System would not operate as described to Al's and as Al's had every right to expect that System to perform. Al's would suffer substantial damages from the New System's inability to perform tasks that could be and were performed using the Former System.

54.   Hollander also knew or should have known that Al's was relying on the New System to operate in an enhanced and productive manner resulting in a seamless transition from the Former System to the New System and to continue its operations without material interruption, inconvenience or expense.

55.   The damages Al's suffered as described above were proximately caused by Hollander's breach of it obligation to use and effect commercially reasonable efforts to correct the problems with the New System.

56.   Hollander's failed and flawed attempts to correct the many problems with the New System evidenced Hollander's utter inability to correctly put their System into working order.  The New System failed in essential purpose.  The latent defects in that

System were not apparent so these defects would be discoverable by Al's in an exercise of reasonable diligence prior to acquiring the System. Hollander's repair efforts were not comprehensive, knowledgeable or timely. The New System, as sold, was an ineffective product. Hollander demonstrated ineffective technical assessment and ineffective repair.

57.     Hollander made numerous false promises after the Sales Agreement was executed and problems with the New System arose that it would and could correct and repair the New System. None of these representations were valid. Hollander during the first month of the installation, sought to shift responsibility to Al's for the New System failures. Hollander insisted that Al's use of a voice over IP Network (voice and data share the same cabling) was the cause of many of the errors. Hollander insisted Al's convert its network, even going so far as to agree to reimburse Al's for the expense of conversion if after conversion the problems continued. Al's had its phone system and data network fully separated at a cost of $4,267.22, (never reimbursed) but the errors and flawed performance persisted. Hollander also insisted Al's RAM was insufficient in all its workstations. Al's purchased and installed additional RAM and this did not help. No minimum RAM requirements for the workstations had been specified by Hollander on the pre-installation checklist.

58.     Al's believed and therefore avers the New System was underdeveloped. Hollander, Al's believed, knew there were multiple problems mandating significant redesign, technical review and modifications to the New System during the time Hollander decided not to support the Former System and while Hollander was selling the New System to Al's, all of these necessities kept hidden from Al's.

59.    Hollander's breach of warranty as above described was a total and fundamental breach of the entire Sales Agreement. The New System did not conform as installed to Al's reasonable expectations from the Sales Agreement. The New System did not confirm to the Sales Agreement. Al's was not provided what it bargained for. Al's was wrongly deprived by Hollander of total performance. The inherent incapacity of the New System was concealed from Al's by Hollander prior to purchase.

60.    The expenses incurred by Al's as described above in attempting to deal with the deficiencies of the New System were reasonable under the circumstances.

**WHEREFORE**, Al's demands judgment against Defendants and seeks compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), plus interest, attorneys fees, expert fees, and all other costs incurred or likely to be incurred.

## COUNT II
## BREACH OF WARRANTY OF MERCHANTABILITY

61.    Plaintiff hereby restates and realleges each and every allegation set forth above with the same force and effect as if set forth herein and repeated at length.

62.    Section 2314(a) of the UCC provides that "[u]nless excluded or modified (Section 2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."

63.    Section 2314(b) of the UCC provides in pertinent part:

(b) **Merchantability standards for goods.**—Goods to be merchantable must be at least such as:

(1) pass without objection in the trade under the contract description;

\*         \*         \*

(3) are fit for the ordinary purposes for which such goods are used.

64.    In Section 3 of the Sales Agreement, Hollander attempts to disclaim the

warranty of merchantability by stating:

> EXCEPT AS SPECIFICALLY PROVIDED HEREIN, THERE ARE NO
> WARRANTIES, EXPRESS OR IMPLIED, INLCUDING, BUT NOT LIMITED
> TO, ANY IMPLIED WARRANTIES OR MERCHANTABILITY OR FITNESS
> FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PRODUCT OR
> EQUIPMENT.

(Emphasis in original.)

65.    In Section 3(b) of the Sales Agreement, Hollander attempts to limit the

extent of its liability to Al's for damages to the lesser of (1) the amount of actual damages

incurred by Client or (ii) an amount which will not exceed one month's average total

monthly charges paid by Client for the particular Products as to which Client's claims

relates during the twelve months proceedings the month in which the damage or injury is

alleged to have occurred, or such lesser number of months if Client has not received

twelve months of Products.

66.    Section 2302(a) of the UCC provides in pertinent part:

> **(a) Finding and authority of the court.**—If the court as a matter of law finds the
> contract or any clause of the contract to have been unconscionable at the time it
> was made, the court may:
>
> (1) refuse to enforce the contract;
>
> (2) enforce the remainder of the contract without the unconscionable clause; or
>
> (3) so limit the application of any unconscionable clause as to avoid any
> unconscionable result.

67.    Management of Al's extensive parts inventory depended heavily on the Former System at the time Hollander advised Al that Hollander would no longer support the Former System.

68.    Al's was faced with a take-it or leave-it proposition when Hollander proffered the Sales Agreement (with its attempted limitation of warranty and damage provisions) and, because of its complete reliance on the Former System (and the presentations that the New System would permit Al's to continue to operate in the same fashion, if not ultimately benefit from the New System's flexibility), Al had no choice but to accept.

69.    The purported disclaimer of warranty and limitation of damages is one-sided in the present context so as to constitute an unconscionable provision that, pursuant to Section 2302(a) of the UCC, it cannot be enforced.

70.    Absent the unconscionable provisions, a warranty of merchantability would be implied to the Sales Agreement.

71.    The New System would not pass without objection in the trade under the contract description nor would it be deemed fit for the ordinary purposes for which such goods are used.

72.    As a result of the non-merchantability of the New System, Al's suffered substantial damages as described above.

**WHEREFORE**, Al's demands judgment against Defendants and seeks compensatory damages in an mount in excess of Seventy-Five Thousand Dollars ($75,000.00), plus interest, attorneys fees, expert fees, and all other costs incurred or likely to be incurred.

## COUNT III
## BREACH OF WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

73.     Plaintiff hereby restates and realleges each and every allegation set forth above with the same force and effect as if set forth herein and repeated at length.

74.     Section of the 2315 of the UCC provides:

§ 2315. **Implied warranty: fitness for particular purpose**

Where the seller at the time of contracting has reason to know:

(1) any particular purpose for which the goods are required; and

(2) that the buyer is relying on the skill or judgment of the seller to select or furnish suitable goods;

there is unless excluded or modified under Section 2316 (relating to exclusion or modification of warranties) an implied warranty that the goods shall be fit for such purpose.

75.     As noted above, the purported disclaimer of any warranty of fitness for a particular purpose contained in the Sales Agreement is ineffective because the enforcement of such provision would be unconscionable in the commercial context of the execution of the Sales Agreement.

76.     Hollander had reason to know of the particular purpose involved in utilization of the New System because Hollander was fully familiar with Al's operations and the fact that Hollander recommended to Al's that Al replace the Former System Hollander would no longer enhance, with the New System, which Hollander also advocated as significantly improved.

77.     The New System was incapable of providing the support that Hollander knew Al's needed to efficiently operate its business.

78.    As a result of the New System's lack of fitness for the purpose for which Al needed to use it, Al's suffered substantial damages as described above

**WHEREFORE**, Al's demands judgment against Defendants and seeks compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), plus interest, attorneys fees, expert fees, and all other costs incurred or likely to be incurred.

### COUNT IV
### FRAUD

79.    Plaintiff hereby restates and realleges each and every allegation set for the above with the same force and effect as if set forth herein and repeated at length.

80.    No later than September, 2001, Hollander was actually aware the New System would not perform as represented to Al's by Hollander and Hollander was aware the System had multiple flaws.

81.    Hollander, not later than September 2001, knew of many of the very problems in the New System described above, were indigenous in the New System purchased by Al's.

82.    Hollander deliberately characterized as proprietary reference information Al's sought, thereby preserving in secrecy the many functional flaws in the New System.

83.    Hollander's refusal to warn or disclose to Al's both the New System's problems and Hollander's lack of capacity to correct and remedy these problems was deliberate, willful and knowing deceit.

84.    Hollander's lack of disclosure, when coupled with its termination of continuing enhancements for the Former System, was a malicious and fraudulent scheme

perpetrated to promote and market an underdeveloped and crippled system utilizing coercion and deception.

85.     Hollander's scienter about the New System included Hollander having been specifically warned of the potential negative consequences for purchasers of the New System long before Hollander began the sales process with Al's.  This specific warning was never passed on to Al's prior to Al's purchase of the system.

86.     Al's prior course of dealing with Hollander involved nothing that would have alerted Al's to the New System scheme Hollander was grifting.

87.     The Hollander – Al's Sales Agreement was a contract productive of unjustified and commercially reprehensible results and steeped in covert and fraudulent conduct by Hollander.

88.     Hollander's representations to Al's were illusory, delusive and immersed in fraud.

**WHEREFORE**, Plaintiff demands judgment against Defendants in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) plus interest and further demands punitive damages be awarded against Defendants together with attorneys fees, expert fees and all other costs incurred or likely to be incurred.

## COUNT V
## COMMERCIAL COERCION

89.     Plaintiff hereby restates and realleges each and every allegation set for the above with the same force and effect as if set forth herein and repeated at length.

90.     Based upon the facts as set out above in this Complaint, Hollander knew and recognized the nature and seriousness of the damage which would result from the installation of an under-designed and flawed system.  Hollander also knew the specific

utilization by Al's of the Former System and the critical and zenith importance to Al's operations and business of the Former System.

91.     Hollander withheld information and misrepresented information about the lack of performance of its New System and created a new system it knew would not sufficiently perform to replace an existing system.  This, combined with Hollander's withdrawing any future enhancements for the Former System to coerce acceptance of the New System, was, in total, particularly nefarious and avaricious conduct designed solely for the financial benefit of Hollander and with no consideration of the impact upon users such as Al's.

92.     Hollander's sole motive in effecting the conduct described in this Count was to profit from the abandonment of a working system so Hollander could realize additional profits and gains without real and significant benefit to users such as Al's and with the goal of perpetuating a systemic obsolescence by arbitrary declaration of Hollander that could also be precedent for similar ploys in the future.

**WHEREFORE**, Plaintiff demands judgment against Defendants in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) plus interest and further demands punitive damages be awarded against Defendants together with attorneys fees, expert fees and all other costs incurred or likely to be incurred.

## COUNT VI
## MISREPRESENTATION

93.     Plaintiff hereby restates and realleges each and every allegation set for the above with the same force and effect as if set forth herein and repeated at length.

94.     Hollander willfully and intentionally misrepresented to Al's the suitability, feasibility, and competence of the New System Hollander was pressuring Al's to accept

and purchase to replace Hollander's Former System. That Former System operated quite well.

95.    Hollander's methodology of discontinuing its enhancements for the Former System was intended to both coerce and induce Al's to purchase the New System.

96.    Since Al's had had a successful course of dealing with Hollander in the purchase and utilization of the Former System, Al's relied upon the representations of Hollander and had no basis to do otherwise.

97.    As has been stated throughout this Complaint, the representations of Hollander were knowingly false and designed to lure Al's into the purchase of the New System.

**WHEREFORE**, Plaintiff demands judgment against Defendants in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) plus interest and further demands punitive damages be awarded against Defendants together with attorneys fees, expert fees and all other costs incurred or likely to be incurred.

## COUNT VII
## INTENTIONAL AND CULPABLE HARM

98.    Plaintiff hereby restates and realleges each and every allegation set for the above with the same force and effect as if set forth herein and repeated at length.

99.    In order to benefit themselves, Defendants, in total disregard of the seriousness of the harm to Plaintiff and by creating a scenario where Plaintiff had no practical choice except to accept the New System, seriously and significantly, as heretofore described, caused harm and injury to Plaintiff.

100.   As Plaintiff has detailed in this Complaint, the nature and significance of the interests promoted by Defendants was to serve themselves by implementing and selling a New System to Plaintiff that Defendants knew had significant and serious flaws which would render the New System impotent for the purposes of Plaintiff's business. Defendants further knew or should have known that once the New System became inoperative and dysfunctional, the result would be bringing Plaintiff's business to its knees and causing Plaintiff significant and serious damages.  Despite that, and in order simply to promote gain to themselves, Defendants persisted with the installation of the New System and its promotion.

101.   As described by Plaintiff in this Complaint, the methods used by Defendants were scurrilous, false, dishonest, and deceptive.  The misrepresentatives, half-truths, concealed circumstances, and high pressure coercion employed by Defendants evidence the character of the means used by them.

102.   Defendants' sole motive was to profit regardless of the consequences, harm, expenses, and clearly predictable and observable detriment to users of the New System such as Plaintiff.  That motive, reprehensible to the zenith, was willful, intentional, and carefully orchestrated.

**WHEREFORE**, Plaintiff demands judgment against Defendants in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) plus interest and further demands punitive damages be awarded against Defendants together with attorneys fees, expert fees and all other costs incurred or likely to be incurred.

## COUNT VII
## FRAUDULENT CONCEALMENT

103.    Plaintiff hereby restates and realleges each and every allegation set for the above with the same force and effect as if set forth herein and repeated at length.

104.    Hollander's intentional non-disclosure of material, salient facts as earlier set out involving the New System's limitations was intentional concealment of these material, salient facts.

105.    Hollander had an affirmative duty to make these disclosures to Al's.

106.    Had Hollander made the material, salient factual disclosures, these revelations would have led to Al's not consummating purchase of the New System.

107.    Hollander was also in a fiduciary relationship to Al's mandating the highest degree of truthfulness and fairness.

**WHEREFORE**, Plaintiff demands judgment against Defendants in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) plus interest and further demands punitive damages be awarded against Defendants together with attorneys fees, expert fees and all other costs incurred or likely to be incurred.

Respectfully submitted,

OF COUNSEL:                         /s/  John P. Elliott  - JE 954_____
ELLIOTT GREENLEAF&              MARVIN L. WILENZIK
    SIEDZIKOWSKI, P.C.             JOHN P. ELLIOTT
                                    Union Meeting Corporate Ctr. V
                                    925 Harvest Drive
                                    Blue Bell, PA  19422
                                    (215) 977-1000

                                    Counsel for Plaintiff

DATED:  February 14, 2008

29

EXHIBIT "A"

FEB.16.2002 4:35AM ADP NO.577 P.2

**POWERLINK**

Business Name: AC's Auto Parts   ADP Hollander Sales Rep: David Kassler

Address: 4339 Old Lincoln Hwy   Contact: Rob

City: Trevose   State: PA   Zip: 19047   County: _____

Telephone: 215-322-2199   Fax: 215-357-6051   Form of Payment: ___ Cash ___ Lease

Customer #: 4050   Salvage License #: _____   Requested Installation Date: _____

## 1. PRICING AND SCHEDULING

A. Fees Due and Payable by Client to ADP Hollander, Inc. ("ADP Hollander") with respect to the Products and Equipment (as such terms are defined below):

| Total One -Time Initial Investment Payment: $ | Initial Monthly Fees: $ |

B. Initial Investment Payment Schedule: $_____ due with order; $_____ due on _____, 200___. $_____ final Initial Investment Payment is due on the first day of the installation. Pricing is valid for 30 days from the date of acceptance by Client noted below. Prices exclude 1) all taxes (including sales tax) ,2) shipment, duties, and other fees outside the continental U.S. and 3) any other items not specifically included and expressly identified and being included.

C. The Initial Investment Amount Set Forth Above Includes: Conversion of ADP Hollander system data (to the extent that such data format is compatible with Powerlink software), on-site training and installation of the Products (and Equipment (if any)), and initial licenses from ADP Hollander of the Powerlink application and Hollander Interchange.

D. Initial Monthly Fees amount set forth above includes continuing licenses of and support for the Powerlink software application and the Hollander Interchange (including unlimited toll-free telephone support for the Powerlink application). Support for third party software and/or Equipment is provided only to the extent expressly elected by Client on the Pricing Schedule (as such term is defined in Paragraph 2 below).

E. If Client postpones a scheduled installation date, Client shall pay an additional charge in an amount determined as follows: if such postponement occurs more than two (2) weeks prior to such date, such charge shall be equal to 10% of the total contract price; if such postponement occurs within two (2) weeks of such date, such charge shall be equal to 25% of the total contract price.

F. The charges for the Products and Equipment are specified in the Pricing Schedule and may be increased as set forth in the Pricing Schedule or, if not specifically set forth in the Pricing Schedule, in accordance with ADP Hollander's then-prevailing policies.

G. ADP Hollander will invoice Client for the Products each month during the term of this Agreement. Client shall pay all invoices within 30 days of receipt. If Client fails to pay any amount due under this Agreement, Client shall, upon demand, pay interest at the rate of 1-1/2% per month (but in no event more than the highest interest rate allowable) on such delinquent amounts from the due date until the date of payment.

H. There shall be added to all charges for the Products and Equipment amounts equal to any applicable taxes levied or based on the Products and Equipment furnished Client hereunder, exclusive of tax based on ADP Hollander's net income.

## 2. PRODUCTS AND EQUIPMENT

ADP Hollander agrees to furnish to Client, and Client agrees to purchase or license from ADP Hollander, as applicable, in accordance with the terms and conditions of this Agreement, the products and services (other than equipment) (collectively, the "Products") set forth on the ADP Hollander Powerlink Pricing Schedule(s) attached hereto (the "Pricing Schedule"). ADP Hollander further agrees to sell to Client, and Client agrees to purchase from ADP Hollander, at Client's election, the equipment, if any, set forth on the Pricing Schedule (the "Equipment").

With respect to the Equipment, Client will provide suitable electrical services for operation of the Equipment and will provide a suitable environment for the Equipment as described in the Equipment manufacturer's specifications. Client shall be permitted to utilize or acquire its own equipment needed to operate any Software (as such term is defined in Paragraph 9 below) provided by ADP Hollander to Client pursuant to this Agreement so long as such equipment meets all technical requirements specified by ADP Hollander as being necessary for the optimal performance of such Software (it being acknowledged by Client that Client is responsible for determining whether and to what extent any such equipment satisfies such requirements (if any) or is otherwise suitable for use with such Software).

Client acknowledges that some or all of the Products and/or Equipment provided by ADP Hollander to Client pursuant hereto are designed to become inoperable and/or inaccessible unless updates to such Products and/or Equipment which ADP Hollander provides from time to time are immediately installed by Client, and that such updates will be provided by ADP Hollander to Client only upon the continued timely payment by Client of all fees and other charges applicable to such Products, Equipment or updates thereto (and only so long as Client is not otherwise in default of its obligations hereunder). Accordingly, Client agrees to immediately install all Product and/or Equipment updates received from ADP Hollander.

## 3. WARRANTY

ADP Hollander warrants that the Products (other than third party software applications, as to which ADP Hollander makes no warranty) will conform to their respective functional and technical specifications. Such specifications are subject to amendment from time to time by ADP Hollander, in which case the Products will conform to their modified respective specifications. *ADP Hollander does not warrant any of the Equipment. However, ADP Hollander agrees to pass on to Client any transferable hardware manufacturer warranties for the Equipment. This warranty shall not extend to any Equipment which has been altered, changed or modified in any way without ADP Hollander's prior written consent in each instance, is not purchased by Client from ADP Hollander, and/or is not set forth on the Pricing Schedule.* EXCEPT AS SPECIFICALLY PROVIDED HEREIN, THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PRODUCTS OR EQUIPMENT.

#### 4.  TERM OF AGREEMENT; TERMINATION

This Agreement shall commence on the date the Products are first used by Client or the date this Agreement has been executed by ADP Hollander as set forth below, whichever is earlier, until terminated by either party upon at least 60 days prior written notice to the other party.  Paragraphs 1, 5, 11 and 13 shall survive any termination of this Agreement.

#### 5.  OWNERSHIP AND CONFIDENTIALITY

A.   Client acknowledges that all databases, computer programs, interchange systems and component portions thereof including, without limitation, numbering codes, denotations, indexes, interchange numbers, part type names and part type numbers and all related information and documentation used or furnished by ADP Hollander in connection with the Products will at all times be and remain the exclusive property of ADP Hollander or third parties for whom ADP Hollander is acting as distributor or licensee, and Client shall not have any ownership interest in the Products.  All title and copyrights in and to the Products (including, without limitation, all Software) are owned by ADP Hollander or the third parties for whom ADP Hollander is acting as distributor or licensee.

B.   Client shall not copy, in whole or in part, any of the Products or related documentation, whether in the form of computer media, printed or in any other form.  Client may not recompile, decompile, disassemble, reverse engineer, or make or distribute any other form of, or any derivative work from, the Products (including the databases and computer programs contained therein).

C.   Client shall treat as confidential and shall not disclose or reveal any of the Products or any trade secrets or other proprietary data or information related thereto (the "Confidential Information"), in any form to any person without the prior written consent of ADP Hollander, except that Client may disclose the Confidential Information to its employees for purposes specifically relating to Client's use of the Products.

D.   Client agrees to take appropriate steps to notify its employees who are permitted access to the Confidential Information of Client's and their obligations with respect thereto.  Client will instruct such persons to keep the Confidential Information confidential by using the same care and discretion that Client uses with respect to its own trade secrets and proprietary data and information.

#### 6.  AVAILABILITY AND USE OF THE PRODUCTS AND EQUIPMENT

A.   Client assumes exclusive responsibility for the consequences of any instructions it may give to ADP Hollander regarding the Products or Equipment, for its failure to properly access or use the Products or Equipment in a manner prescribed by ADP Hollander, and for its failure to supply accurate input information.

B.   In order to improve the quality of service to Client, ADP Hollander reserves the right to designate and make reasonable changes in rules of operation, Client identification procedures, type of Equipment to be used with the Products and type and location of service equipment.  Client agrees that it will use the Products and Equipment in accordance with such rules as may be established by ADP Hollander from time to time.

C.   Client agrees that it will use the Products only for its own internal and proper business purposes (in accordance with such policies and requirements as ADP Hollander may from time to time institute) and will not sell, license or otherwise provide, directly or indirectly, any of the Products or any portion thereof to any third party.

D.   Client shall not make any alteration, change or modification to any of the Products, without ADP Hollander's prior written consent in each instance.

E.   Client shall promptly install any and all updates to the Products furnished by ADP Hollander.

#### 7.  COMMUNICATIONS LINES

A.   Client shall order the installation of appropriate communications lines and equipment to enable Client to access or use the Products, and for ADP Hollander to provide support and maintenance services to Client.  It is understood and agreed that Client shall pay all charges relating to the installation and use of communications lines and equipment in connection with the Products, unless otherwise agreed in writing by ADP Hollander and Client.

B.   ADP Hollander shall not be responsible for the reliability and continued availability of the communications lines and equipment used by Client in accessing or using the Products.

C.   Client shall be responsible for all charges relating to long distance, message units, cellular and 800# use for accessing the network connecting to ADP Hollander's host computer or server, if applicable.

#### 8.  FILE SECURITY

A.   ADP Hollander reserves the right to issue and change procedures from time to time to improve file security.

B.   ADP Hollander will take reasonable precautions to prevent the loss or alteration to any data, but ADP Hollander cannot guarantee against any such loss or alteration.  Accordingly, Client will maintain a procedure external to the Products for reconstruction of lost or altered data to the extent deemed necessary by Client.  In connection with the foregoing, it is understood that Client shall maintain appropriate back-up information and shall assume and be responsible for risk of loss and/or damage to documents and records.

#### 9.  SOFTWARE

A.   To the extent that the Products contain any systems programs, applications programs, databases, interchange systems and related information and documentation (collectively, the "Software"), Client acknowledges that it is a licensee of such Software. Client accepts such licenses from ADP Hollander for the Software upon the terms and conditions set forth in this Agreement.

B.   Client acknowledges that some of the Software provided to Client pursuant hereto are third party software applications.  ADP Hollander is an authorized distributor or licensor of such third party software applications (which may include, but are not limited to, Independent Systems Programming, Catalyst SocketWrench, Seagate Crystal Reports and Microsoft applications).  Client agrees to comply with the terms of the third party license agreements (if any) for such applications; in the absence of such third party license agreements, such applications shall be deemed licensed by ADP Hollander pursuant to this Agreement.

C.   The licenses for the Software granted by ADP Hollander to Client hereunder convey personal, non-exclusive, non-transferable rights to Client to use such Software for the limited purposes set forth herein and solely at the location indicated above.

D.   Except to the extent permitted by Paragraph 2 above, Client may use the Software only on equipment sold by ADP Hollander to Client or otherwise authorized by ADP Hollander in writing.  Client shall not make any alteration, change or modification to any Software.

#### 10.  RISK OF LOSS OF EQUIPMENT

ADP Hollander shall assume all risk of loss or damage to the Equipment (if any) while such Equipment is in transit to Client. Client shall assume all risk of loss or damage at all other times.  No loss, theft or damage after delivery of the Equipment to Client shall relieve Client from its obligation to make the payments or to perform its other obligations under this Agreement.

#### 11.  RETURN OF PRODUCTS

Upon termination of this Agreement for any reason, Client's license to and/or right to use the Products shall immediately cease.  In such event, Client shall (a) immediately cease to use the Products, (b) return to ADP Hollander any and all copies of the Products and Confidential Information (including, without limitation, worksheets, documentation, computer program media, security devices and CDs) relating to the Products which are in

its possession or in the possession of its employees or agents and (c) deliver to ADP Hollander an affidavit signed by an appropriate officer of Client which certifies that Client has fully complied with its obligations in the immediately preceding clauses (a) and (b).

## 12. LAWS AND GOVERNMENTAL REGULATIONS

A. Client shall be responsible for (i) compliance with all laws and governmental regulations affecting its business and (ii) any use it may make of the Products to assist it in complying with such laws and governmental regulations. ADP Hollander shall not have any responsibility relating thereto including, without limitation, advising Client of Client's responsibility in complying with any laws or governmental regulations affecting Client's business.

B. If providing any of the Products to Client hereunder violates, or in ADP Hollander's judgment is likely to violate, any laws or governmental regulations, ADP Hollander may, immediately upon written notice to Client, cease providing the affected Products to Client.

## 13. LIMITATION OF LIABILITY

A. ADP Hollander's sole liability to Client or any third party for claims, notwithstanding the form of such claims (e.g. contract, negligence or otherwise), arising out of ADP Hollander's breach of the warranties set forth in Paragraph 3 above shall be to use commercially reasonable efforts to correct such unavailability, interruption, delay, error, omission, bug or other failure as soon as reasonably practicable.

B. ADP Hollander shall not have any liability under this Agreement for any money damages resulting from claims from claims made by Client or any third party for any and all causes covered by Paragraph 13(A) above. ADP Hollander's sole liability under this Agreement for money damages resulting from claims made by Client or any third party arising from or related to any and all causes not covered by Paragraph 13(A) above shall be limited to the lesser of (i) the amount of actual damages incurred by Client or (ii) an amount which will not exceed one month's average total monthly charges paid by Client for the particular Products as to which Client's claim relates during the twelve months preceding the month in which the damage or injury is alleged to have occurred, or such lesser number of months if Client has not received twelve months of Products. Such damages shall be the full extent of ADP Hollander's monetary liability under this Agreement regardless of the form in which any such legal or equitable claim or action may be asserted against Hollander and shall constitute Client's sole monetary remedy.

C. ADP Hollander shall not be liable or deemed to be in default for any delay or failure to perform under this Agreement resulting directly or indirectly from any cause beyond ADP Hollander's reasonable control.

D. IN NO EVENT WILL ADP HOLLANDER BE RESPONSIBLE FOR SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES WHICH CLIENT MAY INCUR OR EXPERIENCE ON ACCOUNT OF ENTERING INTO OR RELYING ON THIS AGREEMENT, EVEN IF ADP HOLLANDER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 14. DEFAULT BY CLIENT; REMEDIES UPON DEFAULT

Should Client (a) default in the payment of any sum of money hereunder, (b) default in the performance of any other of its obligations under this Agreement, or (c) commit an act of bankruptcy or become the subject of any proceeding under the Bankruptcy Act or become insolvent, or if any substantial part of Client's property becomes subject to any levy, seizure, assignment, application or sale for or by any creditor or governmental agency, then, in any such event, ADP Hollander, at its option, may, immediately upon written notice to Client, (i) terminate this Agreement and (ii) declare all amounts due and to become due hereunder immediately due and payable. The remedies contained in this Paragraph 14 are cumulative and in addition to all other rights and remedies available to ADP Hollander under this Agreement, by operation of law or otherwise.

## 15. GENERAL

A. Client acknowledges that it has not been induced to enter into this Agreement by any representation or warranty not set forth in this Agreement. This Agreement contains the entire Agreement of the parties with respect to its subject matter and supersedes all existing agreements and all other oral, written or other communications between them concerning its subject matter. This Agreement shall not be modified in any way except by a writing signed by both parties.

B. This Agreement may not be assigned by Client, in whole or in part, without the prior written consent of ADP Hollander. This Agreement shall be binding upon and shall inure to the benefit of ADP Hollander and Client and their respective successors and permitted assigns.

C. If any provision of the Agreement (or any portion thereof) shall be held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remainder of this Agreement shall not in any way be affected or impaired thereby.

D. The headings in this Agreement are intended for convenience of reference and shall not affect its interpretation.

E. The individuals executing this Agreement on behalf of ADP Hollander and Client do each hereby represent and warrant that they are duly authorized by all necessary action to execute this Agreement on behalf of their respective principals.

F. All notices shall be in writing and shall be forwarded by registered or certified mail and sent to ADP Hollander and Client at the addresses set forth on the first page of this Agreement or to any other address designated in writing hereafter. Any notice to ADP Hollander shall be sent Attention: Controller, ADP Hollander., 14800 28th Avenue North, Suite 190, Plymouth, Minnesota 55447, and shall include a copy to Automatic Data Processing, Inc., One ADP Boulevard, Roseland, New Jersey 07068, Attention: General Counsel.

G. A breach of any provision of Paragraphs 5 and/or 9 of this Agreement will cause ADP Hollander irreparable injury and damage and therefore may be enjoined through injunctive proceedings in addition to any other rights or remedies which may be available to such party, at law or in equity.

**ADP Hollander**
14800 28th Avenue North, Suite 190,
Plymouth, Minnesota 55447-4868

By: _____
(signature)

Name/Title: _____
(print or type)

Date Signed: _____

X _____
Name/Title: Robert Grougler / Manager
(print or type)

X Date Signed: 2/15/02

ADP HOLLANDER RESERVES THE RIGHT TO REVOKE ITS ACCEPTANCE OF THIS AGREEMENT DUE TO ERRORS OR MISCALCULATIONS MADE ON THE PRICING SCHEDULE AND/OR THIS AGREEMENT



## Pricing Schedule ~ U.S.

| 14800 28th Avenue North, Suite 190, Plymouth, MN 55447 | Phone: 800/761-9266 · Fax: 800/933-0039 |
|---|---|
| Sales Representative: David Kassin | Proposal Date: 2-15-02 |

Business Name: AL's Auto Parts Inc      Owner:

Address: 4339 Old Lincoln Hwy                    Phone: 215 - 322 - 2199

City: Trevose     State: PA     Zip: 19047     Fax: 215 - 357 - 6051

### Monthly Fees for Powerlink Licensed Users

| Product Code | Number of Licensed Users | Monthly License Fee |
|---|---|---|
| | | $ |

### Initial EDEN Set-Up Fee(s)

| Product Code | (Refer to "EDEN Services Schedules" for EDEN monthly fee structures) | Initial EDEN Set-up Fee(s) |
|---|---|---|
| HEDENSU | EDEN Set Up Fee | $ |
| HEDENMS-SU | EDEN Multi-Site Set Up Fee | $ |
| HEDENSU-DH | EDEN Direct Hit Set Up Fee | $ |
| HEDENSU-OL | EDEN Online Set Up Fee | $ |
| HWEBSU | Web Hosting Set Up Fee | $ |

### Initial Powerlink License User Fee including Install/Training

| Product Code | Number of Licensed Users | Estimated Install/ Training Days | Total Initial License and Install/Training Fee |
|---|---|---|---|
| | | | |

### Servers

| Client Election | Servers Selections | Price/Unit US | Qty | Total |
|---|---|---|---|---|
| | **Dell PowerEdge 2500 "Office Class"** (Intel Pentium III processor, 256 MB ECC SDRAM, 18.2 GB SCSI HDD, CD ROM, on board Intel Pro 10/100 network card, internal 100T DDS4 tape backup w/10 tape cartridges, Multi-Tech 56K ext. modem, APC 700 Smart UPS w/Powerchute Plus, MS Windows 2000 Server 5 CAL, pcAnywhere, cable kit ext, mouse pad, 15' patch cable, new installation kit) | $ 5,995 | | $ |
| | **Dell PowerEdge 2500 "Business Class"** (Intel Pentium III processor, 384MB ECC SDRAM, 2 18.2 GB SCSI HDD mirrored, with Perc2, CD ROM, on board Intel Pro 10/100 network card, internal 100T DDS4 tape backup w/10 tape cartridges, Multi-Tech 56K ext. modem, APC 1000 Smart UPS w/Powerchute Plus , MS Windows 2000 Server 5 CAL, pcAnywhere, cable kit ext., mouse pad, 15' patch cable, new installation kit) | $ 6,795 | | $ |
| | **Dell PowerEdge 2500 "Enterprise Class"** (2 Intel Pentium III processors, 512 MB ECC memory, Perc 2 128 mb card level 5 RAID controller, 3-18.2 GB SCSI Hot-swappable HDD, CD ROM, on board Intel Pro 10/100 network card, internal 100T DDS4 tape backup w/10 tape cartridges, Multi-Tech 56K ext. modem, server utilities, APC 1000 Smart UPS w/Powerchute Plus, MS Windows 2000 Server 5 CAL, pcAnywhere, Cable kit ext., mouse pad, 15' patch cable, new installation kit) | $ 8,195 | | $ |

### TERM

The initial term of this Pricing Schedule shall be twelve (12) months from the date of installation. Following the initial term, this Pricing Schedule shall continue on a month-to-month basis until terminated by either party upon at least sixty (60) days prior written notice. This Pricing Schedule is subject to the additional terms and conditions of the Powerlink Agreement to which this Pricing Schedule is subject.

### Additional License Information and Software and Hardware Support

The Powerlink application licenses granted pursuant hereto are "fixed" (i.e., not concurrent licenses; accordingly, each such license is for Client's use at a specific, fixed individual computer workstation or terminal. Any manipulation of user addressing to permit access to the Powerlink application by additional users or at additional or different workstations or terminals is expressly prohibited and in violation of the terms of the Powerlink Agreement. The number of users licensed on a given server is determined by the Powerlink Licensed Users as agreed to and specified on this Pricing Schedule. Additional Powerlink Licensed Users can be purchased by contacting ADP Hollander.

In consideration of the monthly license fee set forth above, ADP Hollander will provide (a) Powerlink application updates and enhancements and (b) customary telephone software support of the Powerlink application. Powerlink support will be provided during ADP Hollander's normal business hours in accordance with such policies and procedures of ADP Hollander as may be in effect from time to time. Client acknowledges that some of the Software provided to Client pursuant hereto are third party software applications and is not included in Powerlink application support. Dell DirectLine Plus Software Phone Support is available from Dell Computer. If client elects not to purchase Dell DirectLine Plus Software Phone Support, out of scope service may be offered by ADP (at its option) at ADP's then current billable rates. Please contact ADP for further details regarding such other support.

For the PowerEdge 2500 "Office Class", "Business Class", or "Enterprise Class" Server(s) listed above, "Type 2" warranty service is available from Dell computer. "Type 2" service agreements are available from Dell Computer and currently provide " 24 x 7" service (with a 4-hour or less response time) for users within a 125 mile radius of Dell stocking locations in the U.S. and Canada. A listing of cities with Dell stocking locations is available upon request. *Type 2 service is limited to the server hardware only and for a period of three years from date of purchase.* Peripheral hardware and workstations are not included in such service agreements. For manufacturer's warranty details, please refer to the actual *limited warranty statement* included in the documentation accompanying your system.

ADP Hollander disclaims any hardware warranties but agrees to pass on to Client any transferable hardware manufacturer warranties for the Product(s) specified in this Pricing Schedule. This warranty shall not extend to Product(s) which have been altered, changed or modified in any way by Client or are not listed on this Schedule.

Product information is based on latest information available and subject to change without notice.

*Please acknowledge your agreement to the foregoing by initialing here: _____*

### Server Options

| Client Choice | Options | Product Code | Price/ Unit | Qty | Total |
|---|---|---|---|---|---|
| | • Supply, Power Redundant, Hot Plug | H72030 | $ 368 | | $ |
| | • | H | $ | | $ |
| | • Controller, PERC2-DC 5 Raid with 128MB Cache | H72045 | $ 943 | | $ |
| | • Memory, 133MHz 256 MB DIMM Upgrade | H72012 | $ 294 | | $ |
| | • Memory, 133MHz 128 MB DIMM Upgrade | H72010 | $ 176 | | $ |
| | • Tape Drive, Dell 2400 PV100T DDS4 | H72040 | $ 618 | | $ |
| | • Hard Drive, 18.2GB, LVD/ SCSI, 7.2K, 1.0, Hard Drive for PowerEdge 2400 | H72020 | $ 375 | | $ |
| X | • Microsoft Win 2000 Server w/5 Client Access License (for cals 1 thru 5) - * this line entry is only applicable if client is purchasing the server through ADP Hollander | H03970 | $ 919 | 1 | $ * included in server |
| | • Microsoft Win 2000 Server w/5 Client Access License (for cals 6 thru 10) (minimum qty 5) | H96513 | $ 34 | 5 | $ |
| | • Microsoft Win 2000 Server 1 Client Access License (for cals above 10) | H96513 | $ 34 | | $ |
| | • Microsoft Win NT 4.0 to 2000 Upgrade License | H94142 | $ 419 | | $ |
| | • Kit, Microsoft Win NT 4.0 to 2000 Media CD & Doc | H94143 | $ 27 | | $ |
| | • Microsoft NT 4.0 to 2000 - 1 Client Access License | H96683 | $ 17 | | $ |
| X | • SQL Server 2000 w/5 Client Access License | H96511 | $ 0 | 1 | Inc in Powerlink Lic |
| X | • SQL Media kit | H96515 | $ 0 | 1 | Inc in Powerlink Lic |
| | • SQL Server 2000 1 Client Access License Add on | H95429 | $ 0 | | Inc in Powerlink Lic |

### Network Hardware

| Client Choice | Network Hardware Selections | Product Code | Price/ Unit | Qty | Total |
|---|---|---|---|---|---|
| | Cable, AT Modem (6 feet) | H70102 | $ 7 | | $ |
| | Cable, Digi RJ45/DB25 Synch Shield | H70081 | $ 25 | | $ |
| | Cable Par Ptr Std (10 feet) | H70103 | $ 10 | | $ |
| | Cable, Ser Null mdm (6 feet) | H70133 | $ 20 | | $ |
| | Card, Fast Etherlink 10/100 TX | H70049 | $ 100 | | $ |
| | Card, PCMCIA-Ethernet (x-jack connector for laptop) | H70029 | $ 145 | | $ |
| | Card, PCMCIA 3-Com 10/100 | H09634 | $ 99 | | $ |
| | Hub, 3 COM 8 Port 10/100 | H70079 | $ 290 | | $ |
| | Hub, 3 COM 16 Port 10/100 | H70080 | $ 455 | | $ |

### Accessories

| | HARDWARE: | | | | |
|---|---|---|---|---|---|
| | Cable, Kit Extension, Mouse, Monitor, Keyboard | H02750 | $ 11 | | $ |
| | Card, 320 Turbo Serial (Okidata) | H70095 | $ 85 | | $ |
| | Board, Acceleport 2R 920-PCI (requires AT Modem Cable – H70102) | H99926 | $ 196 | | $ |
| | Board, Acceleport 8R 920-PCI (requires Octal Cable - H70056) | H97714 | $ 679 | | $ |
| | Cable, Octal – DIGI | H70056 | $ 60 | | $ |
| | Drive, Tape 14 GB HP Internal | H15097 | $ 265 | | $ |
| | Modem 33.6 (EDEN) – (requires AT Modem Cable H70102) | H70134 | $ 123 | | $ |
| | Modem Multi-Tech Ext. 56K ZDX – (requires AT Modem Cable H70102) | H70013 | $ 155 | | $ |
| | Monitor, 15" Flat Panel | H72115 | $ 798 | | $ |
| | Monitor, 17" Flat Panel | H72116 | $ 1,376 | | $ |
| | Monitor, 17" Delta | H07107 | $ 199 | | $ |
| | Monitor, 17" Black | H72117 | $ 279 | | $ |
| | Monitor, 19" Delta | H07119 | $ 314 | | $ |
| | Monitor, 19" Black | H72119 | $ 423 | | $ |
| | Monitor, 21" Hitachi | H07121 | $ 1,233 | | $ |
| | Monitor, 21" Black | H72121 | $ 1,296 | | $ |
| | Printer, Okidata Okipage 14E | H10671 | $ 385 | | $ |
| | Printer, Okidata 320 Turbo, serial | H70016 | $ 500 | | $ |
| | Printer, HP Laser 4000 | H10453 | $ 1,295 | | $ |
| | Printer, HP Laser 4100N | H10454 | $ 1,799 | | $ |
| | Print Server, HP Jet Direct 300X | H70203 | $ 259 | | $ |
| | Print Server, HP Jet Direct 500X | H70204 | $ 345 | | $ |
| | Processor – Second (2500) 933 MHz 256 MB (must match existing processor) | H96319 | $ 375 | | $ |
| | Tape, Cartridge 20/40 DLT-2 DT (10 pack) | H70100 | $ 523 | | $ |
| | 1 Additional Day-Training/Installation | HCT | $ | | $ |
| | 1 Additional Day-Systems Engineering | HPLINKSE | $ | | $ |

| | SOFTWARE: | | | | |
|---|---|---|---|---|---|
| | | | | | $ |
| | | | | | $ |

### Workstations

| Client Choice | Workstation Selections | Product Code | Price/ Unit | Qty | Total |
|---|---|---|---|---|---|
| | GX 110 Small Form 4MB video, 10/100 NIC, 256K Cache, 128 MB NonECC, 100 MHZ, 10GB EIDE Hard Drive, 3.5" FFD, CD-ROM, Integrated Sound Card, MS Windows 2000 Professional, keyboard, mouse. | H72500 | $ 1,052 | | $ |

### Workstation Accessories

| Client Choice | Item Name | Product Code | Price | Qty | Price |
|---|---|---|---|---|---|
| | Memory – 64 MB | H70090 | $ 175 | | $ |
| | UPS, 700 Smart w/Powerchute | H70025 | $ 395 | | $ |
| | UPS, 1000 Smart w/Powerchute | H70024 | $ 540 | | $ |

### New Client Supplies

| Client Choice | Item Name | Product Code | Price | Qty | Price |
|---|---|---|---|---|---|
| | Invoice and Tag Starter Kit (includes 1000 tags, 500 invoices, 500 sheets of paper) | H96057 | $ 34 | | $ |
| | 500 ft. roll cable (serial) | H99064 | $ 110 | | $ |
| | Male connectors | H99062 | No Chg | | $ |
| | Female connectors | H99063 | No Chg | | $ |
| | Hoods for connectors | H99059 | No Chg | | $ |
| | 10' Parallel cable | H02500 | $ 4 | | $ |
| | 25' Parallel cable | H99074 | $ 12 | | $ |
| | 50' Parallel cable | H02503 | $ 17 | | $ |
| | * Parallel cable is needed for printers linking direct to PC/Workstations | | $ | | $ |

### Miscellaneous Supplies

| Client Choice | Item Name | Product Code | Price | Qty | Price |
|---|---|---|---|---|---|
| | | H | $ | | $ |
| | | H | $ | | $ |
| | | H | $ | | $ |
| | | H | $ | | $ |
| | | H | $ | | $ |

### Network Operating System Support

| Client Choice | Item Name | Product Code | Price | Qty | Price |
|---|---|---|---|---|---|
| | **Dell DirectLine Plus Software Telephone Support**<br>Products supported under DirectLine Plus: Microsoft Windows 2000, SQL Server.<br>Hours: 24 x 7. Response Time: 1-hour critical (system down) 2-hour non critical. DirectLine Plus covers: proposed corrections for hardware/NOS error messages.<br>Problem determination may include information gathering, analysis, research including reproducing systems, and/or acquiring additional information.<br>Problem Resolution may include providing a resolution or steps towards a resolution, workaround configuration changes, and/or escalate a bug report.<br>Additional administrative services, such as assistance with installation of the NOS or other utility software or application, on the basis of one issue per hour or any part of an hour. DirectLine Plus Does Not Cover Any on-site services.<br>Quantity: 30 resolutions<br>Expires: Three years from date of purchase. | H73000 | $1,940<br>(non-refundable) | | |

### Shipping

| | | | |
|---|---|---|---|
| | SHIPPING   (=1% of total order) | | $ |

| TOTAL 1-TIME INITIAL INVESTMENT: | $ |
|---|---|

**ADP Hollander**

| By: _____ | CLIENT |
| (signature) | By: _____ |
| | (signature) |
| Name/Title: _____ | Name/Title: Robert Crowgler / Manager |
| (print or type) | (print or type) |
| Date Signed: _____ | Date Signed: 2/15/02 |

Powerlink2 Pricing Schedule –US 11.30.2001                                    Page 3 of 3